And good afternoon. The first case this morning is No. 06-1158 Verage Group v. United States. Mr. Wendt. Thank you, Your Honor. Good afternoon. May it please the Court, I'm Daniel Warrington. With me is Peter Tennant. He represents the Varaj Group, which includes two stainless steel bar producers from India, Varaj Alloys and Varaj Info Expo. This case is about Commerce's decision to treat Varaj Alloys and Varaj Info Expo as a single entity, in other words, to collapse them during an administrative review. The CIT has reversed that decision and has ordered Commerce to calculate a separate rate for Varaj Info Expo, separate from Varaj Alloys. The CIT's decision should be reversed for at least three reasons. One, the CIT had the third decision, Slater 3, it stated that the 2000-2001 review, the review under appeal now, Commerce had changed its practice from prior reviews, especially the 1998-99 administrative review, stating that Commerce had made an affirmative determination in that review not to collapse the Varaj Group. But that's incorrect. First, there was no affirmative statement by Commerce in that review stating its decision nor any reasons for not collapsing the Varaj Group. But they didn't collapse it nevertheless. And we also believe that the facts would show that they did in fact treat Varaj Alloys and Varaj Info Expo as a single entity in that review, and therefore they did collapse. And the Commerce Department explained this in that it had applied adverse facts available and then facts available to Varaj Info Expo for the failure to report home market sales by Varaj Alloys. And the only way that it would have reached that determination would be based on the conclusion that Varaj, or its treatment of Varaj Info Expo and Varaj Alloys as a single entity. The net that we've come up with is relatively small, so we're really talking more about the principle, I suppose. The principle of... I mean, after the way that they treated it, which you say is incorrect, nonetheless, the margin was quite small. Yes, it was still less than 1%. But it was a critical difference because it then exceeded the de minimis margin, or the de minimis level. And this review has led to subsequent reviews where Varaj has succeeded in getting three straight consecutive de minimis or zero rates, therefore qualifying for replication. By a procedure which collapsed the sources? Yes, and those later decisions also collapsed. Second, the collapsing decision at Commerce was correct. Commerce followed its regulation. It determined properly that Varaj Alloys and Varaj Info Expo produced similar products, stainless steel bar, and that Varaj Alloys, without substantial retooling, could add the same products that Varaj Info Expo now produces, and that the manipulation problem of the collapsing regulation was satisfied. And this decision was entirely consistent with Commerce's practice of collapsing integrated producers, those producers that started with raw inputs and then would finish products, with those producers affiliated finishing operations. And third, the decision was incorrect because in rejecting the Commerce Department's final results and its remand redeterminations, the CIT endorsed several interpretations of the collapsing regulation that significantly limit Commerce's policy for collapsing, vis-a-vis the major input rule, the very same policy that this court affirmed in the decision A.K. Steele. In its brief, the domestic industry stated that it's at a loss to understand why the policy affirmed in A.K. Steele has been raised in this appeal. We've raised A.K. Steele because that case was about the balance between the collapsing policy on one hand and the major input rule on the other, as well as the fair value provision. Each of these provisions are tools that Commerce has available for handling affiliated party issues and anti-dumping proceedings. In Korea Steele, which was the administrative proceeding underlying A.K. Steele, Commerce changed its policy and gave priority to the collapsing provision, stating that at the outside of the cases, as soon as is practical, it will decide whether or not to collapse affiliated parties, and that if it does decide to collapse those parties, it will exercise its statutory discretion to disregard the major input rule or the fair value provision. This court affirmed that policy without qualification in A.K. Steele. But the CIT, again, has endorsed several interpretations of the collapsing regulation, which would in effect conduct an end run around the policy as affirmed in A.K. Steele. I want to focus on two interpretations of the collapsing regulations that would do that. The first has been referred to as the vice versa standard. In Slater 2, the CIT stated, speaking about the collapsing regulation, that the regulation appears to require that Commerce examine the production facilities of both or all companies and evaluate the possibility that production may be shifted from one company to another and vice versa. Commerce here has examined only whether production could be shifted from barrage info expo to barrage alibis, and that's consistent with the general practice of collapsing finishing operations that just do the very tail end of manufacturing with larger integrated affiliated producers. This vice versa standard would preclude Commerce from collapsing in those instances, and it would require Commerce, as a precondition to collapsing, find that the finishing operations such as barrage info expo, without substantial retooling, could add all of the manufacturing capacity to produce their own inputs. Counsel, if I said to you that this court is not going to permit oral argument by either party, would that mean one party to you or both parties? That you would not permit oral argument by either party. To me, that would mean both parties. How is that different from what the CIT said either meant in the context of the regulation 351-401? How is that different from what Commerce said? No, what the CIT determined, the vice versa, meaning it has to apply both ways, and my understanding is Commerce said no, one way is all that's necessary. Isn't that right? Right, that's correct. Okay, so how is my interpretation that you just endorsed, which I think is like the CIT's interpretation of the word either, how is that not what should apply in this case? So the CIT's interpretation is reasonable, and what I'd say is different is that the interpretation that it means any of the above, especially when there's more than two, is also reasonable because there are several dictionary definitions that also support Commerce's interpretation, and that when competing dictionary definitions affect the interpretation of a dictionary definitions, but also practical ramifications of that decision, then Commerce's decision should be left undisturbed unless it's unreasonable. So what you're saying is we should be giving seminal rock deference to Commerce's and agency's interpretation of their own regulation, and not be giving deference to the CIT, but instead reviewing de novo what they looked at? Yes, I'm not familiar with seminal rock, but yes, that's correct. Why shouldn't we give the CIT deference? Why should? Why shouldn't we? Why shouldn't we? Yeah. I mean, they're an intermediate court that reviews all of the Commerce stuff before it comes to us. Why shouldn't we be giving them deference? If both interpretations are reasonable, and you're saying we need to defer to the agency because it's the agency, why aren't we deferring to the CIT? I believe it's maybe established in statute. I know it's established in practice, but also because Commerce handles much larger volumes of cases. The CIT is a specialized court, that's true, and it is very knowledgeable about anti-dumping cases. But it's not familiar with the, especially the nitty-gritty details of cases, and it's not as familiar, and Commerce is the master of anti-dumping proceedings. I believe is the catchphrase of dumping law. For example, I know in softwood lumber, if this policy were reversed and affiliated finishing operations were not collapsed with integrated producers, that may have doubled the workload for the Department of Commerce in calculating separate rates for all of its parts. Do you want to save the rest of your time? Yes, I do. Thank you, Your Honor. Thank you, Mr. Wendt. Ms. Gilbert. Thank you, Your Honor. For the record, my name is Robin Gilbert, representing the plaintiff, Apalis, in this matter. I know that you've read the brief, so I won't, I will try not to repeat what we've already said, but just highlight certain aspects of what we have said in our brief. One of the most interesting aspects of this case is the great irony here, and that is that from the very beginning, Barrage argued to Commerce during the review that it should be collapsed, saying that this would prevent its affiliates from engaging in manipulation. This in itself should have had Commerce look askance at why the companies would ask to be collapsed. This is not normally what respondent companies do in a review. It's the domestic industry that asks for it, because of the way that the analysis often works. In this case, though, it was Barrage saying to Commerce, you should collapse us, and that is when the domestic industry started to look very close at this and looking at why this would be, and that's one of the reasons why we fought this very hard during the review and then appealed it to the Court of International Trade. There had to have been some other reason why Barrage was asking for Commerce to collapse, something other than to keep the companies themselves from manipulating the process. But it wasn't the Court of International Trade's skepticism of Barrage's motives that guided the Court's decisions. As you can see from the number of reviews that the Court, the remits that the Court ordered, and I would say the excessive detail with which the Court looked at everything before it, that the Court simply went through the record painstakingly and fully and asked Commerce numerous times to explain why what it had done could be considered to be done on the basis of substantial evidence. And in the end— Are Barrage's motivations at all relevant to what is before us? Not at this point, Your Honor. I'm just saying that the Court wasn't motivated by that, even though I think that Commerce should have looked a little bit more askance at why the companies would be asking for this and not simply accepting this as something, as even a reason why they should be collapsed. So Commerce—I'm sorry. No, please. Because they are the investigating agents. So Commerce shouldn't just apply its regulations fairly and uniformly, but rather look into the motivations of the parties before applying its regulations? No, Your Honor. First, they need to apply their regulations fairly, and in this case, they didn't apply their regulations consistently. And I'll address the point that you were asking Mr. Wendt about, if I may, which is the question of whether there had been a determination in the second review to collapse the Barrage companies. Commerce was merely inferring that it had made a decision to collapse. There's nothing on the record that says whether it had collapsed in that review. We know from the first review, and there's no dispute about that, they did not collapse. So at least out of the first three, there was a decision not to collapse. But they—no, no, no. They didn't make a decision not to collapse. They made no decision at all on the issue of collapse. But they did not collapse in the first— But they didn't say they weren't going to collapse when we reached that stage. I'm sorry. I'm not sure I understand that part of your question. In the first review also, this was before, if I understand it right, before the AK Steele decision, before other decisions where we said—or where Commerce has determined that now it has to go sort of with an either-or approach. So in the first review, my understanding is their application of the major input rule is not an indication at all that they're not going to collapse, that they might not collapse these parties, but rather simply that's what they did prior to changes that occurred that said you go one way or the other, according to Commerce. But Commerce would not have applied the major input rule if it had collapsed the companies, even though now Commerce may be told that it—well, AK Steele really only says a couple of things that are relevant here. One is that when Commerce decides to collapse, it will not apply the major input rule and the fair value rule. But that's new. That wasn't in existence at the time of the original. Yes, and the other point of that case is that Commerce still may apply the major—or may not apply the major input and fair value rule, even if it doesn't collapse. But in any event, during the first review, this wasn't—you're right, this wasn't an issue that was even discussed. They just simply did not collapse. But when Commerce said in response to the remand that they had collapsed in the second review, they were really only going back and trying to figure out from what they could see what they did. They didn't have—typically when you see these decision memos, they have a separate section on collapsing. There was nothing in that for the second review. So one must wonder whether there's any evidence really that you could hang your hat on that they had actually collapsed. They didn't collapse or not collapse just as a matter of whim or arbitrariness in this back and forth between Commerce and the Court of International Trade. What keeps shining forth, it seems to me, is that they're trying to figure out how, in this case, with this particular party that's the subject of the complaint, how in fact do we figure out the fair value? What goes into it when you're using different manufacturing plants and a lot of other things? It's not simple. So in some ways, it's hard to say that there is or isn't a general rule. But in your view, from the viewpoint of your representing this industry, what would in fact be the fairest measure of the fair value with which this particular importer, producer is to be charged? That is, collapsing or not collapsing or partially collapsing? They've tried them all, haven't they? In this case, based on Barrage's own data, and there are these schemata that the Court of International Trade referred to that are in the questionnaire responses from Barrage, they depicted the process that Barrage Alloys went through and that Barrage Info Expo went through. And you could see, and then we also just explicated more on that, that the kind of production that Barrage Alloys was in was very different and much more costly than the kind of finishing operations that Barrage Info Expo conducted. Barrage Info Expo, Commerce said, agreed with us that they could, it was a lot less expensive and the Barrage Alloys could add the type of equipment to do the finishing operations very easily. And so that's what they based their decision to collapse on. We, of course, in reference to this vice versa argument, said that you can't look at just whether one of the two companies could adopt a new process and not have to spend a lot of money and make a lot of other changes to do so. You have to look at both parts, because that's the whole idea of the manipulation problem, is whether they could shift back and forth, not just one to the other, but the other one to the other on the other side. But Commerce gave a very thorough, and it seems to me, very well-reasoned explanation of why they didn't consider that to be necessary. It was not simply an uninformed judgment call. It was a thorough and thought-out analysis. And the question, it seems to me, is why, if that thorough and what appears to me, at least, to be well-reasoned analysis is reasonable, then on what basis would we overturn it? Because the facts don't support. Your analysis doesn't support the facts. And so the standard... Well, the analysis explained why they believed, in the context of these proceedings, it wasn't necessary to go both ways, that if one facility could be adjusted with relatively little modification, that that would be sufficient. Because, after all, that would set the stage for some manipulation. Well, Your Honor, the only thing that I can say is that if you go back to the purpose of the collapsing regulation, it was designed to prevent companies that are affiliated from being able to manipulate their production operations and their pricing so that they could take advantage of the ability to shift production from one company to another. But here we have, you know, for these bright bars, you have one company that has the ability to produce the bright bars, and another company that produces the, I guess they're called black bars, and with a relatively slight modification, those black bars could be converted to bright bars. And therefore, according to Commerce's analysis, you had the ability with little modification for one company to produce the products of the other company, and that would satisfy the regulation as they see it. And it seems to me if it's their regulation, and if the analysis is reasonable, then it would be difficult, if not impossible, for us to say otherwise. Well, there are two parts to my response to that. One is that in a related review of stainless steel wire rod from India involving the barrage companies, Commerce had done this type of analysis before and had actually said that they, and they had had this come up during an appeal of that review, and they had stuck to their position that collapsing was not warranted in that first review. In another review of German bar, Commerce looked at very similar facts to what we have in this case and said, no, we're not collapsing the companies because there's an overlap in production. They explained it in more detail, and it's referred to in our brief and in the Board of International Trade's opinions. So Commerce was acting inconsistently with what it had done in other cases. Well, I'm not addressing or questioning the consistency point. I'm just talking about the reasonableness of their analysis, their interpretation of their own regulation. Well, I think that it was inherently unreasonable for them to take the position that they only had to look at whether manipulation could go in one of two directions. But why? Isn't the goal on the part of Commerce to prevent manipulation? And if the manipulation can go in one of two directions, Commerce would generally seek to prevent the manipulation. If you require both sides to be able to manipulate by going either way in order for Commerce to collapse companies, then it makes it harder for Commerce to prevent manipulation, right? Because then Commerce has to be able to prove that everybody could manipulate, not just one party. So why wouldn't that be a reasonable interpretation by Commerce to prevent manipulation? Well, if you have that set of facts, then maybe that would be a good reason to collapse. If you have more of an indication that the manipulation could go in not just one direction or it could only squarely go in one direction here, first of all, you have the company itself, the companies themselves saying, we're afraid we're going to manipulate. That doesn't make sense. So they have that as something to factor into this, because that is part of what they have to do as the investigating agency. And then to say that, no, we're not going to look any further than whether you could do it one way or another. I understand that this, but it's a case by case approach that Commerce has to look at with the facts. The facts of this case show that the companies weren't likely to be able to have Barrage Alloys, or I'm sorry, Barrage Expo, the exporter, take on the kind of billet making capacity with the melting operations and all of the extreme costs that that entails, just to be able to shift to a lower dutied company. It just wasn't going to happen in this case. And by ignoring that, then they were not properly and reasonably applying the regulation. I would like to say a couple of other things, because I have about a minute left. Barrage decides a case deal frequently, yet we've talked about that. The Court of International Trade never held low in this case that the major input and fair value provisions of Commerce's regs might have been more appropriate than collapsing. Nor did the Court even analyze that issue. The Court merely mentioned the major input rule as an example of why it is so important for Commerce to properly apply the collapsing regulation, because if that isn't necessary, then it shouldn't be applied, because then it would prevent the agency from applying the major input rule and the fair value rule, if it's necessary. Let me just make sure I understand this argument. Are you saying that in all cases, Commerce should apply the fair value and major input rules and apply the collapsing requirements, and then make a determination over which one would be better to apply, so in all instances, they have to determine all of this stuff and then figure out whether to collapse? No, Your Honor. They don't have to make that decision as early as they have claimed, either. We argued from the beginning of the review that they needed to get enough information so that they could look at everything and then make a determination based on what they saw. To narrow things so quickly in a review does also not—we haven't raised this as an appeal issue, but it's part of it—it does not give the agency the ability later on to decide whether it should apply collapsing or the major input rule because of what it learns through the course of the review. They cannot make such a limiting decision in the beginning, and I think that may be what happened here. They got caught having made the decision early on, and then they were left without any information by which to apply the major input rule. It's not relevant, I know, to speculate why they did it, but that may be why. That's why it's important to recognize that the agency should get this collapsing issue decided correctly because they may need to apply the major input rule. And finally, I would just like to say that Barrage had argued that the Court never considered most of the arguments that Congress made in the remands, and you can see from looking at the Court's opinions that that isn't true. Okay, we have that argument. That's not a critical one. Thank you, Ms. Gilbert. Mr. Wendt. Thank you, Your Honor. I'd like to make a couple points here. First, the collapsing regulation, unlike other provisions, is what I would call neutral. Zeroing almost always increases margins for respondents. Sometimes collapsing increases margins. Sometimes it decreases margins. Congress has put forth its regulation and administered it in a way that is not results-driven. For example, sometimes domestic industry, such as the domestic industry in this case, opposes collapsing, or I'm sorry, is in favor of collapsing, as it was in the stainless steel bar from Germany case that's discussed. And I believe that the Court's, the CIT's decision of forcing Congress to consider the major input rule at the time when it decides whether or not to collapse would be introducing a results-driven test into the collapsing decision. Well, it is really an attempt, though, to try and find some sort of common ground as to why in some cases it is more reasonable to collapse and in some why it isn't. And this rule is an approach that makes sense, does it not? The CIT's approach of considering the major input rule. I believe it would basically gut the policy that Congress adopted of not applying the major input rule when it collapses. Because the CIT's decision of making each party show that it could change production, well, in those instances when that test is met, both manufacturing facilities probably are not going to be sharing inputs and are probably not going to be sharing intermediate products like they are in this case where you have black bar going to a bright bar producer. And so the collapsing decision would probably, the major input rule in that situation would not apply regardless of the collapsing decision. Yes, I can see that it wouldn't always apply. So it's in situations like this where the policy that Congress adopted of disregarding the major input rule when it collapses really bears almost entirely on cases like this where you're finishing operations, acquiring intermediate products from integrated producers. And so if you adopted the CIT's reasoning, although it sounds like a carefully tailored limitation on that policy, it really takes 90% of the effect of that decision away. So it's largely a reversal of that decision. And although that policy may have been reasonable if Congress had adopted it, to have the CIT impose that on Congress is an impermissible act. Another point I'd like, I'd just like to clarify to follow up on some discussion. As the court mentions in the New Ship review, there was no affirmative discussion of collapsing and that it was prior to a case deal. And so even if they had collapsed, it wouldn't have had the same importance it has today. And that in the prior, in the 98-99 Administrative Review, again there was no discussion of collapsing or not. And so we think it's unreasonable that Congress should somehow be bound by an alleged prior practice when that prior practice had never been discussed or briefed by any of the parties. Third, I'd also like to say that a case deal really was about the, when it's proper for Congress to exercise its statutory discretion to disregard the major input rule. And so in this case for the CIT to state that the government, and this is from Slater too, needs to examine the relative merits of collapsing vis-a-vis the major input rule as applied or applicable to the facts of this case, really reigns in Congress's discretion on when it can or must consider the major input rule. I see one time, Mrs. Carter. Okay. Thank you, Mr. Wayne. Thank you, Ms. Gilbert. The case is taken under submission.